SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

DIMENSIONAL ENTERTAINMENT CORPORATION et al., Defendants.

No. 77 Civ. 5290 (CHT).

United States District Court, S. D. New York.

July 16, 1980.

**1272**

Stephen L. Hammerman, Regional Administrator, Securities and Exchange Commission, New York City, for plaintiff; Jason R. Gettinger, Joseph C. Arellano, New York City, of counsel.

Golenbock & Barell, New York City, for defendant Sam Ford; Seymour Kleinman, New York City, of counsel.

Dan Brecher, New York City, for defendant Leonard D. Levin.

1. These sections provide:
    (a) Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—
    (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or
    (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

    .    .    .    .    .

    (c) It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 77h of this title.

2. This section provides:
    It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—
    (1) to employ any device, scheme, or artifice to defraud, or

OPINION

TENNEY, District Judge.

This civil action was instituted by the Securities and Exchange Commission ("SEC") and involves a complex securities fraud scheme in which defendants Sam Ford and Leonard Levin, among others, illegally distributed and manipulated the trading market for the common stock of Dimensional Entertainment Corporation ("Dimensional"). The SEC claims that defendants Ford and Levin violated sections 5(a), 5(c) [1] and 17(a) [2] of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77e(a), 77e(c) and 77q(a) and section 10(b) [3] of the Securities Exchange Act of 1934 ("Securities Exchange Act"), 15 U.S.C. § 78j(b). Both defendants are also charged with violations of Rule 10b–5,[4] 17 C.F.R. § 240.10b–

    (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
    (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

3. § 10(b) states:
    It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
    (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

4. The Rule makes it unlawful
    for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
    (a) To employ any device, scheme, artifice to defraud,
    (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances

5, while only Ford is alleged to have violated Rule 10b–6,[5] 17 C.F.R. § 240.10b–6. The SEC seeks a permanent injunction enjoining the defendants from committing further violations of these provisions. In addition, the SEC asks the Court to order Ford and Levin to disgorge the profits they allegedly reaped through the fraudulent securities scheme. The Commission has now moved for summary judgment.

The Court finds that the defendants have committed the various securities laws violations with which they are charged. However, for the reasons given below, the Court concludes that it would be inappropriate to issue a permanent injunction against Ford on the basis of the evidence presented by the SEC. Accordingly, the Commission is granted sixty days from the entry of this Opinion and Order to address the issues discussed herein and to submit additional evidence regarding the likelihood that Ford will repeat his unlawful conduct. If no further submissions are made, the motion for injunctive relief against Ford will be denied. The SEC's motion for a permanent injunction against defendant Levin is granted. Because disgorgement orders against both defendants appear warranted, and the precise sums involved are uncertain, these matters will be referred to Magistrate Naomi R. Buchwald for a report and recommendation. 28 U.S.C. § 636(b)(1)(B). After receiving the Magistrate's recommendation, the Court will rule on the requested disgorgement orders.

*Background*

The factual and legal background of this case has previously been described in the Court's decision denying Levin's motion to dismiss the SEC's complaint against him, Memorandum and Order dated August 16, 1978, and in the Second Circuit's decision affirming Ford's conviction for wire fraud and perjury in a criminal action stemming from the events involved here. *United States v. Ford,* 603 F.2d 1043 (2d Cir. 1979). This action was commenced in 1977 when the Commission filed a complaint against fifteen individuals and entities seeking permanent injunctive relief against further violations of certain anti-fraud provisions of the federal securities laws. The complaint also sought an accounting or disgorgement of profits by Ford and Levin. Each of the defendants, except Ford and Levin, have consented to judgments or permanent injunctions.

In March 1978, a federal grand jury in the Southern District of New York returned a twenty-two count indictment against Ford and four other individuals. They were charged in count one with securities fraud, in counts three through eleven with mail fraud, in counts twelve through fourteen with wire fraud, and in count fifteen with conspiracy to obstruct justice. Counts sixteen and seventeen charged Ford with perjury before the SEC. The remaining counts pertained to the other individuals. Before trial, three of the defendants pleaded guilty. Ford and co-defendant Barbara Belle were tried in September

under which they were made, not misleading, or
    (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the sale or purchase of any security.

**5.** Rule 10b–6 provides in part:
    (a) It shall constitute a "manipulative or deceptive device or contrivance" as used in section 10(b) of the Act for any person,
    (1) who is an underwriter or prospective underwriter in a particular distribution of securities, or
    (2) who is the issuer or other person on whose behalf such a distribution is being made, or

    (3) who is a broker, dealer, or other person who has agreed to participate or is participating in such a distribution, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, either alone or with one or more other persons, to bid for or purchase for any account in which he has a beneficial interest, any security which is the subject of such distribution, or any security of the same class and series, or any right to purchase any such security, or to attempt to induce any person to purchase any such security or right until after he has completed his participation in such distribution . . . . .

1978. At the close of its case, the government consented to dismiss several of the mail fraud claims. The jury then found Ford and Belle guilty of wire fraud, as alleged in counts twelve through fourteen, convicted Ford on the perjury charge alleged in count seventeen, and acquitted both defendants on the remaining charges. Ford received a sentence of five years imprisonment and a $1,000.00 fine on each of the wire fraud counts, the sentences to run concurrently and the fines to be cumulative. Ford was sentenced to an additional three years imprisonment and an additional $2,000.00 fine for the perjury conviction. These convictions were subsequently upheld by the Second Circuit. *United States v. Ford, supra.*

On the day that Ford was indicted, Levin pleaded guilty to a two-count information charging him with violations of section 17(a) of the Securities Act, section 10(b) of the Securities Exchange Act, and Rule 10b–5. He was fined $10,000.00, placed on eighteen months probation, and received a suspended sentence. Levin testified for the government during the grand jury investigation and at Ford's criminal trial. His testimony included statements concerning monies he had received from Ford and his own participation in the fraudulent plan to distribute Dimensional securities.

*Summary Judgment*

When confronted with a motion for summary judgment, a district court "cannot try issues of fact; it can only determine whether there are issues to be tried." *American Mfrs. Mut. Ins. Co. v. American Broadcasting-Paramount Theatres, Inc.*, 388 F.2d 272, 279 (2d Cir. 1967). Yet even in an SEC action seeking injunctive relief, the court should not hesitate to grant a request for summary judgment if the defendant fails to demonstrate that there is a genuine issue for trial. *SEC v. Research Automation Corp.*, 585 F.2d 31, 33–34 (2d Cir. 1978); *see* Fed.R.Civ.P. 56(e). Summary judgment is inappropriate, however, where conflicting inferences regarding state of mind or intent can reasonably be drawn from the facts established. *Robertson v. Seidman & Seidman*, 609 F.2d 583, 591 (2d Cir. 1979).

*The Case Against Ford*

The SEC contends that Ford's criminal conviction "for the same unlawful conduct alleged in the Commission's amended complaint" conclusively establishes the violations of the registration and anti-fraud provisions that are the grounds for the injunctive and disgorgement relief sought in this civil action. As stated by the Second Circuit, "[i]t is well-settled that a criminal conviction, whether by jury verdict or guilty plea, constitutes estoppel in favor of the United States in a subsequent civil proceeding as to those matters determined by the judgment in the criminal case." *United States v. Podell*, 572 F.2d 31, 35 (2d Cir. 1978), *citing McCarthy v. United States*, 394 U.S. 459, 466, 89 S.Ct. 1166, 1170, 22 L.Ed.2d 418 (1969); *United States v. Frank*, 494 F.2d 145, 160 (2d Cir.), *cert. denied sub nom. Borgman v. United States*, 419 U.S. 828, 95 S.Ct. 48, 42 L.Ed.2d 52 (1974). The doctrine of collateral estoppel may apply even though a different party has instituted the second action because mutuality is generally no longer required. *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979); *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 320–27, 91 S.Ct. 1434, 1438–1442, 28 L.Ed.2d 788 (1971); *SEC v. Kelly, Andrews & Bradley, Inc.*, 385 F.Supp. 948, 954–55 n.27 (S.D.N.Y.1974). Indeed, the United States Attorney's office and the SEC have been considered to be the same party "in that both represent the United States." *SEC v. Everest Management Corp.*, 466 F.Supp. 167, 172 n.6 (S.D.N.Y.1979).

In *Podell*, the Second Circuit indicated that to determine the collateral estoppel effect of a criminal judgment, the court in a subsequent civil action should ascertain what was decided in the criminal case by examining the record, the pleadings, the evidence submitted, and any judicial opinions issued in the case. *United States v. Podell, supra*, 572 F.2d at 36; *see Emich Motors Corp. v. General Motors Corp.*, 340 U.S. 558, 569, 71 S.Ct. 408, 414, 95 L.Ed. 534 (1951). For example, in *SEC v. Everest Management Corp., supra*, the court grant-

ed the SEC's motion for summary judgment on the basis of the defendant's prior criminal convictions. The court stated:

> These fraudulent activities, alleged against Persky in this civil action, were "distinctly put in issue and directly determined," . . . in Persky's two prior criminal convictions. Persky was initially convicted for filing a false and misleading Form 10–K for Microthermal in violation of section 15 of the Securities Exchange Act of 1934 . . . . The criminal indictment . . ., the record of that case, and the affirming appellate decision . . . make clear that Persky's conviction rested upon the same fraudulent acts outlined above and alleged in the civil complaint of this action: the attempt by Persky and others to conceal from the public and the Commission the misappropriation of approximately $500,-000 of Microthermal's funds. Persky's subsequent criminal conviction for violating section 10(b) of the Securities Exchange Act of 1934 . . . and SEC Rule 10b–5 concerned in large part the very same transaction—Microthermal's purchase of U. S. Secretarial stock—which is alleged in the civil complaint of this case. . . . It is far too late in the day for Persky to deny the existence of these violations for purposes of this civil suit.

466 F.Supp. at 173–74 (citations and footnote omitted).

■ Upon reviewing the various documents submitted by the SEC, and reading the comments of the trial court judge in Ford's criminal case and the Second Circuit's opinion affirming his conviction, the Court concludes that the factual determinations necessarily made by the jury in convicting Ford for wire fraud and perjury also establish the violations of the securities laws alleged here. The judgment entered after Ford's trial states that he was

convicted as charged to the offenses of unlawfully, wilfully and knowingly, and for the purpose of employing the fraudulent scheme and artifice to defraud set forth in paragraphs 1 through 7 of the Indictment, 78 Cr. 141, causing to be transmitted by means of wire and radio communications in interstate commerce certain writings, signals, pictures and sounds, as set forth in Counts 12, 13 and 14 of said indictment (18 U.S.C. §§ 1343 and 2); and unlawfully, wilfully and knowingly, and contrary to an oath that defendant would testify truly before . . [the SEC], in a case in which a law of the United States authorized an oath to be administered making false and material declarations which he knew to be false, as set forth in Count 17 of the indictment (18 U.S.C. § 1621).

Judgment and Disposition, 78 Cr. 141 (LFM), filed October 17, 1978, Exhibit C to Affidavit of Jason R. Gettinger, sworn to September 28, 1979 (hereinafter referred to as the judgment). The jury convicted Ford on counts twelve through fourteen, which stated, in part, that he and others "unlawfully, wilfully, and knowingly, and for the purpose of employing and executing the fraudulent scheme and artifice set forth in paragraphs 1 through 7 of this Indictment (the allegations of which are hereby incorporated by reference and realleged as though fully set forth in Counts Twelve through Fourteen), did cause to be transmitted" various communications. In order to convict on the wire fraud counts, the jury must have found that the facts alleged in paragraphs one through seven of the indictment were proved beyond a reasonable doubt. *See SEC v. Everest Management Corp., supra; United States v. Levinson,* 369 F.Supp. 575 (E.D.Mich.1973). Both the judgment and the wire fraud charges expressly incorporate the allegations made in the first seven paragraphs of the indictment. These charges, set out in full below,[6]

---

6.

*COUNT ONE*

The Grand Jury charges:

1. From on or about January 1, 1975, up to the date of the filing of this indictment, in the Southern District of New York, SAM FORD and BARBARA BELLE, defendants, together with other co-schemers known and

unknown to the Grand Jury, unlawfully, wilfully, and knowingly did devise and intend to devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, to wit, a securities fraud scheme involving the fraudulent sale, distribution, and manipulation of the common

essentially alleged that Ford and others knowingly devised a securities scheme to defraud purchasers and obtain funds through false representation by creating an artificial market for unregistered stock. These allegations described Ford's knowing and successful efforts to acquire and distribute purportedly "free trading" stock, to induce purchases through various misrepresentations, and to inflate the market price of the stock. The collateral estoppel effect of the jury's guilty verdict establishes the validity of these allegations, for the jury could not have reached such a verdict without accepting the charges as true.

The SEC concedes that "there may not be an exact congruence between the allegations in this action (Sections 5(a), 5(c) and 17(a) of the Securities Act, and Section 10(b) and Rules 10b–5 and 10b–6 of the Securities Exchange Act) and the findings of wire fraud (18 U.S.C. §§ 2, 1343), in the previous criminal conviction." Memorandum of Law in Support of Plaintiff's Mo-

stock of a corporation first known as Wicker World, Inc. (hereinafter "Wicker World") and later as Dimensional Entertainment Corporation (hereinafter "Dimensional Entertainment").

THE OBJECT OF THE FRAUD SCHEME

2. The object of the scheme was to unlawfully enrich defendants SAM FORD and BARBARA BELLE and their co-schemers through a sophisticated stock swindle that would and did defraud the public of approximately one million dollars.

GENERAL DESCRIPTION OF THE FRAUD SCHEME

3. At all times relevant, Wicker World was a nearly worthless company. In September 1975, defendants SAM FORD and BARBARA BELLE purchased from Leonard D. Levin all of an artificially created pool of purportedly "free trading" shares in Wicker World, knowing that in fact the shares were not eligible for free trading to the public and that, moreover, the shares were nearly worthless. Under their direction and control, Wicker World then declared a 41 to 1 stock dividend, thus providing FORD with 798,000 purportedly "free trading" shares of Wicker World that he could use to carry out this fraud. Also under their direction and control, Wicker World changed its name to Dimensional Entertainment.

4. Beginning in October 1975, both through public brokerage houses in Minneapolis, Minnesota, and elsewhere, and through private sales of stock, defendants SAM FORD and BARBARA BELLE created an artificial market in the stock of Wicker World and Dimensional Entertainment, so as to provide channels by which they could "dump" the stock on the market. Also to this end, they caused others to purchase Wicker World and Dimensional Entertainment stock through undisclosed nominee purchases and through purchases brought about by undisclosed promises and inducements made by them to the purchasers. Among other individuals, MICHAEL D. YORDON and SUSAN E. SMITH knowingly and wilfully participated in making such undisclosed nominee purchases of stock in furtherance of the scheme to defraud, in order to create an artificial appearance of interest in the stock.

5. Beginning in October 1975, defendants SAM FORD and BARBARA BELLE and others, having created an artificial market for the stock, set about fraudulently inflating its price. For this purpose, they made and caused to be made numerous false and misleading representations and statements, both financial and otherwise, concerning Wicker World, Dimensional Entertainment, and a purported subsidiary of Dimensional Entertainment called Dimensional Pictures Corporation. These false and misleading statements were intended to have, and did have, the effect of inducing innocent victims to purchase stock of Wicker World Dimensional Entertainment, and Dimensional Pictures Corporation and to otherwise associate themselves with these companies. As a result of these misrepresentations and false statements, and of various manipulative devices undertaken by the defendants, the price of Dimensional Entertainment stock (which FORD and BELLE had purchased for approximately $.02 per share) rose to approximately $5.00 per share.

6. Beginning in October 1975, and continuing through the summer of 1976, FORD and BELLE profited and attempted to profit them the scheme by selling and participating in the sale of thousands of shares of Wicker World and Dimensional Entertainment. Many of the sales were made through undisclosed nominee accounts, including sales of wilfully and knowingly made on FORD's and BELLE's behalf by SUSAN E. SMITH, PAUL L. HUNTSMAN, JR., and John R. Potter.

7. Throughout the fraud scheme, the defendants and their co-schemers attempted to conceal the entire ongoing scheme from their victims, the investigating public, and from government investigators. Among the devices they used in this endeavor were the use of false and forged documents, receipts, and endorsements; the registry of stock certificates in the names of others; the use of the bank accounts, credit cards, and brokerage accounts of others; and the giving of false statements and false testimony.

tion for Summary Judgment Against Defendant Sam Ford ("SEC Memorandum I") at 8. Pouncing on this obvious weakness in the SEC's case, Ford contends that the Commission is "distort[ing] the doctrine of collateral estoppel . . . with logic strained to the breaking point." Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment Against Sam Ford ("Ford Memorandum") at 8. The Court disagrees. While the statutory violations differ, the factual allegations underlying the wire fraud convictions are sufficient to establish that Ford also violated the securities laws provisions at issue here. The wire fraud statute prohibits the use of wire, radio or television to execute a scheme or artifice to defraud or to obtain money or property by means of false representations or promises. 18 U.S.C. § 1343. In light of the indictment charges upon which Ford's wire fraud conviction was based, the Court concludes that the jury found that he distributed unregistered stock and intentionally engaged in a fraudulent and profitable securities scheme in which he made false and material representations, wrongfully induced purchases, and manipulated the market for Dimensional stock. These acts constitute infractions of the provisions that the SEC contends Ford violated. *See generally Aaron v. SEC*, —— U.S. ——, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980); *Chiarella v. United States,* 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980).

■ A more troublesome aspect of this case is that Ford was acquitted on two counts of securities fraud in his criminal trial—the very charges on which the SEC now seeks summary judgment. In appealing his conviction to the Second Circuit, Ford argued that his conviction in the wire fraud counts and simultaneous acquittal on the securities fraud counts constituted reversible error. The court of appeals quickly disposed of this claim, stating that "[i]t is well settled that even plainly inconsistent jury verdicts, simultaneously rendered, are the jury's prerogative." *United States v. Ford, supra,* 603 F.2d at 1047, *quoting United States v. Zane,* 495 F.2d 683, 690 (2d Cir.), *cert. denied,* 419 U.S. 895, 95 S.Ct. 174, 42 L.Ed.2d 139 (1974). It is equally well

established that an acquittal in a criminal case does not bar a subsequent civil suit arising from the same events. *See United States v. National Ass'n of Real Estate Boards,* 339 U.S. 485, 493–94, 70 S.Ct. 711, 716–717, 94 L.Ed. 1007 (1950); *Neaderland v. Commissioner of Internal Revenue,* 424 F.2d 639, 641 (2d Cir.), *cert. denied,* 400 U.S. 827, 91 S.Ct. 53, 27 L.Ed.2d 56 (1970); *SEC v. Everest Management Corp., supra,* 466 F.Supp. at 174 n.9. The less easily resolved question posed by this case is whether the SEC should be awarded summary judgment on its securities claims on the basis of Ford's wire fraud conviction when the same jury acquitted him on those charges.

The defendant, with a literary flair, asks "[i]s it consistent with traditional principles of equity to hoist a convicted defendant on the petard of his acquittals? Collateral estoppel, Catch 22 or Kafka?" Ford Memorandum at 10. Although the Court does not share the defendant's melodramatic sentiments, it does agree that the jury's acquittal on the securities claims should not be taken lightly. However, it has frequently been stated that "the rationale for the rule permitting inconsistent verdicts in a single trial is that a jury may convict on some counts but not others not because they are unconvinced of guilt, but because of compassion or compromise." *United States v. Greene,* 497 F.2d 1068, 1086 (7th Cir. 1974); *see United States v. Zane, supra,* 495 F.2d at 690; *United States v. Fox,* 433 F.2d 1235, 1238 n.22 (D.C.Cir. 1970); *United States v. Carbone,* 378 F.2d 420, 422–23 (2d Cir. 1967). Obviously, this Court cannot attempt to discern why the jury chose to acquit Ford on some counts and convict on others. Yet because his acquittal on the securities claims may have reflected a compromise or compassionate verdict, and, more importantly, because his wire fraud conviction necessarily rests on factual findings that constitute the securities violations alleged here, the Court concludes that there is no genuine issue of material fact regarding the SEC's claims.

■ While the SEC has successfully carried its burden on this summary judg-

ment motion, the Court rejects the Commission's assertion that "[i]njunctive relief is the appropriate and necessary remedy in the case at bar." SEC Memorandum I at 19. The SEC is authorized to seek injunctive relief "[w]henever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices" that constitute securities laws violations. 15 U.S.C. § 77t(b); see id. § 78u(d). The Second Circuit has stated that:

> A District Judge is vested with a wide discretion when an injunction is sought to prevent future violations of the securities laws . . . and "cessation of illegal activity does not *ipso facto* justify the denial of an injunction." . . . The factors which he may consider include the likelihood of future violations, the degree of scienter involved, the sincerity of defendant's assurances against future violations, the isolated or recurrent nature of the infraction, defendant's recognition of the wrongful nature of his conduct, and the likelihood [sic], because of defendant's professional occupation, that future violations might occur.

*Commission v. Universal Major Industries Corp.*, 546 F.2d 1044, 1048 (2d Cir. 1976) (citations omitted); see *SEC v. Paro*, 468 F.Supp. 635, 649 (N.D.N.Y.1979). This list of considerations is colored by the "current judicial attitude," which has become "more circumspect" than in years past toward issuing injunctions on the basis of previous violations. *SEC v. Commonwealth Chemical Securities, Inc.*, 574 F.2d 90, 99 (2d Cir. 1978), *cited with approval in Aaron v. SEC, supra,* —— U.S. at ——, 100 S.Ct. at 1957. In the *Commonwealth Chemical Securities* case, the court of appeals asserted that, except in cases where the SEC seeks to prevent an ongoing violation, the language of the Securities Act and the Securities Exchange Act require a finding of "likelihood" or "propensity" to engage in future violations. Recent Second Circuit decisions

have emphasized that the SEC must go beyond the mere facts of past violations and demonstrate a realistic likelihood of recurrence. See, e. g. *SEC v. Monarch Fund*, 608 F.2d 938, 943 (2d Cir. 1979); *SEC v. Commonwealth Chemical Securities, Inc., supra,* 574 F.2d at 99, 100; *SEC v. Bausch & Lomb, Inc.*, 565 F.2d 8, 18 (2d Cir. 1977). The SEC has failed to make such a showing with respect to Ford.

In seeking injunctive relief, the SEC relies on Ford's various past securities violations,[7] the wilfullness of his actions, and the key role Ford played in the Dimensional stock scheme. Undoubtedly, these elements are important in determining the propriety of injunctive relief. Yet the SEC has not even addressed the question of Ford's present incarceration pursuant to an eight year prison sentence. In the absence of some allegation that Ford may be paroled in the near future, or that he is currently maintaining ties in the securities market, there is not a realistic likelihood of violations recurring in the near future. The Court firmly rejects Ford's indulgent and unfounded assertion that "[t]he Commission's present request that [he] be further confined by an equitable straitjacket denies all possibility of [his] rehabilitation and suggests that all attempts at rehabilitation during the long and still unexpired term of [his] incarceration will be singularly unsuccessful." Ford Memorandum at 8. Nor does the Court agree that "[h]aving already deployed the cannon," the SEC is now attempting to "use the slingshot." *Id.* However, in the Court's view, the more "circumspect" approach toward issuing injunctions should consider both the likelihood of recurring violations and the relative imminence of this threat. While the SEC need not show that a defendant is likely to break the law next month, or even next year, the risk posed by a potential violator with an unexpired prison term exceeding six years is not sufficient to warrant injunctive relief. Ac-

---

7. In 1971, the Ninth Circuit affirmed Ford's conviction for conspiracy to commit fraud in the sale of securities and for using the mails to commit securities fraud. *United States v. Fishbein*, 446 F.2d 1201 (9th Cir. 1971). These convictions arose from the sale of securities in HiwayHouse Hotels Inc., a corporation in

which Ford (then known as Fishbein) served as chief executive officer and president. In the criminal action based on the events involved here, Ford was convicted on three counts of wire fraud and one count of perjury in connection with a securities scheme. *United States v. Ford, supra.*

cordingly, the SEC's motion for an injunction will be denied sixty days from the entry of this Opinion unless the Commission establishes that the likelihood of further violations is a real probability and not a distant prophecy.

■ The Court does agree, however, that an order compelling the defendant to account for and disgorge his "ill-gotten" gain is appropriate in this case. In the words of the Second Circuit,

> The effective enforcement of the federal securities laws requires that the SEC be able to make violations unprofitable. The deterrent effect of an SEC enforcement action would be greatly undermined if securities law violators were not required to disgorge illicit profits.

*SEC v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1104 (2d Cir. 1972); *see SEC v. Commonwealth Chemical Securities, Inc., supra,* 574 F.2d at 95–96; *SEC v. Shapiro,* 494 F.2d 1301, 1309 (2d Cir. 1974). The SEC asserts that Ford realized an undetermined sum as a result of his fraudulent scheme to defraud innocent Dimensional investors. Ford does not expressly refute this claim. Rather, he contends that disgorgement is appropriate only to reimburse those victimized by a defendant's criminal conduct, not to promote law enforcement. The defendant cites the following statement made by the court of appeals in *SEC v. Texas Gulf Sulphur Co..,* 446 F.2d 1301, 1308 (2d Cir.), *cert. denied,* 404 U.S. 1005, 92 S.Ct. 561, 30 L.Ed.2d 558 (1971), to support this view of the purpose of disgorgement: "Thus we hold that the SEC may seek other than injunctive relief in order to effectuate the purposes of the Act, so long as such relief is remedial relief and is not a penalty assessment." However, the court went on to state that the deprivation of wrongfully received gains did not constitute assessment of a penalty. Furthermore, the court rejected the claim that the disgorgement order was punitive because it did not provide for compensating the injured parties. Ford's assertion that "[r]esearch has uncovered no reported precedent in which a defendant was convicted, imprisoned and

fined . . . and thereafter further punished by an order of disgorgement," Ford Memorandum at 12, does not persuade the Court that such an order is not proper here.

Ford also contends that the criminal trial record reveals that most of the persons who bought and sold Dimensional securities as a result of his transactions "were broker-dealers or sophisticated investors, and not the 'innocent dupes' who would be entitled to restitution via disgorgement." *Id.* Even accepting the validity of this bald assertion, it does not totally eradicate the rationale for ordering a defendant to turn over profits unlawfully received. *See SEC v. Texas Gulf Sulphur Co., supra,* 446 F.2d at 1308. Moreover, Ford has also adopted the completely opposite tack in arguing that a disgorgement order in favor of the SEC would be detrimental to the parties in a class action lawsuit that has allegedly been instituted in Minneapolis, Minnesota "to establish a fund from which restitution can be made to those non-professional buyers and sellers of Dimensional securities who were victimized by the fifteen respondents named in the Commission's action, among others." Ford Memorandum at 12. The defendant has provided no concrete information regarding the pendency of this alleged suit. If such a suit has been instituted, or even if no action has been taken in this regard, the SEC may be directed to hold the proceeds in escrow for a certain period of time so that interested parties may seek restitution from this fund. *See SEC v. Commonwealth Chemical Securities, Inc., supra,* 574 F.2d at 96; *SEC v. Manor Nursing Centers, Inc., supra,* 458 F.2d at 1105. The details of these procedures can be flushed out more fully after a hearing before the Magistrate, who will then provide a recommendation to the Court.

Accordingly, the Court grants the SEC's request that a disgorgement hearing be held before a Magistrate to determine the amount of unlawful profits that Ford should be ordered to turn over to the Commission, or perhaps to a court-appointed trustee.[8] Upon receiving the Magistrate's

---

**8.** This ruling will not be altered by a decision that may be rendered in sixty days denying the

SEC injunctive relief against Ford. Although disgorgement is commonly referred to as "an-

recommendation, the Court will rule on the question of disgorgement and the amount of money that must be relinquished.

## The Case Against Levin

[6] The SEC's summary judgment motion against Levin seeks a disgorgement order and a permanent injunction prohibiting violations of sections 5(a), 5(c) and 17(a) of the Securities Act, section 10(b) of the Securities Exchange Act and Rule 10b–5. The SEC relies primarily on Levin's guilty plea to the criminal charges involved in this case and certain statements he made before the grand jury, at his allocution, and at Ford's trial. The Commission's motion is granted.

In March 1978, Levin pleaded guilty to a two-count Information charging him with violations of sections 17(a), 10(b) and Rule 10b–5. As stated above, it is well established that a criminal conviction, "whether by jury verdict or *guilty plea*, constitutes estoppel in favor of the United States in a subsequent civil proceeding as to those matters determined by the judgment in the criminal case." *United States v. Podell, supra,* 572 F.2d at 35 (emphasis added). Levin's guilty plea thus conclusively establishes that he committed acts in violations of those provisions.

Levin was not charged with, and did not plead guilty to, the registration violations alleged here (sections 5(a) and 5(c) of the Securities Act, see note 1 *supra*). However, the essential facts underlying these violations were alleged in the Information to which Levin pleaded guilty. For example, paragraph 3 states that Levin created an artificial pool of purportedly "free trading" securities not subject to the Securities Act's registration requirements, "by purporting to sell to certain individuals shares . . . pursuant to a public 'Regulation A' offering, and by so stating in letters filed with an office of the [SEC], when in fact, as he then and there well knew, those shares remained subject to his own control and had not become free trading shares." Information, 78 Cr. 144, Exhibit B to Affidavit of Jason R. Gettinger, sworn to September 25, 1979 ("Gettinger Aff."). Paragraph 4 of the Information states that Levin transferred these allegedly "free trading" securities "knowing they were not eligible for such transfer." *Id.* Furthermore, Levin's testimony before the grand jury, at his allocution, and at Ford's trial establishes that he knowingly participated in a fraudulent scheme to publicly distribute Dimensional stock when no Registration Statement was ever filed with the SEC. *See* Gettinger Aff., Exhibit C at 4–7; Exhibit D at JJP 8, 9 and ML 9, 10; Exhibit E at 105–06, 139–41, 169–79. In sum, the Court concludes that there is no genuine issue of fact regarding the SEC's claim that Levin violated the registration provisions of the Securities Act.

■ The factors that should be considered in resolving an SEC motion for injunctive relief were described above. Applying the standard set forth in *SEC v. Universal Major Industries Corp., supra,* and other cases, the Court has determined that Levin should be enjoined from further violating the securities laws provisions cited here. Levin received a suspended sentence after entering his guilty plea and was placed on an eighteen months probation term which has now expired. He wilfully and knowingly participated in this fraudulent securities scheme. Moreover, on February 15, 1977, a Final Judgment of Permanent Injunction by Consent ("consent judgment") was entered against Levin in the case of *SEC v. Candywyne Corp.,* 76–711

---

cillary relief," the remedies are distinct. An injunction should not be a necessary predicate to a disgorgement order if the violations and the receipt of unlawful profits are established. As the Second Circuit stated in *SEC v. Manor Nursing Centers, Inc., supra,* 458 F.2d at 1103:

"Once the equity jurisdiction of the district court has been properly invoked by a showing of a securities law violation, the court possesses the necessary power to fashion an

appropriate remedy. . . . "It is for the federal courts to adjust their remedies so as to grant the necessary relief where federally secured rights are invaded." *J. I. Case Co. v. Borak,* 377 U.S. 426, 433, 84 S.Ct. 1555, 1560, 12 L.Ed.2d 423 (1964).

*See SEC v. Texas Gulf Sulphur Co.,* 446 F.2d 1301, 1308 (2d Cir.), *cert. denied,* 404 U.S. 1005, 92 S.Ct. 561, 30 L.Ed.2d 558 (1971).

Civ. T–H (M.D.Fla.). This consent judgment was the result of an SEC civil action in which it was alleged that Levin and others had made material misrepresentations in connection with the distribution of shares in several different corporations. One of these corporations was Wicker World, Inc. ("Wicker World") which subsequently became Dimensional Entertainment Corp. in November 1975. The 1977 consent judgment enjoined Levin from further violating the precise provisions involved in this SEC action. Levin's propensity for securities laws violations and the likelihood that his unlawful conduct will be repeated have thus been established.

Levin contends that the *Candywyne* consent judgment "estop[s] or "preclude[s]" the SEC from seeking an injunction against him in this action. Affidavit of Leonard Levin in Opposition to SEC's Motion, sworn to November 16, 1979 ("Levin Aff."), ¶¶ 6, 7. According to the defendant, this SEC suit does not involve any acts he committed after the date the consent judgment was entered and so he cannot be subject to another injunction. This same claim was made by Levin when he moved to dismiss the SEC's complaint against him and was firmly rejected by this Court. *SEC v. Dimensional Entertainment Corp.*, Fed.Sec.L. Rep. (CCH) ¶ 96,536 (S.D.N.Y.1978). The Court's previous opinion stated:

> Levin contends that because the events alleged in the *Dimensional* complaint occurred prior to the entry of the consent judgment, because the purportedly fraudulent Regulation A offering of Wicker World/Dimensional shares is an element of both the *Candywyne* and *Dimensional* complaints, and because the *Candywyne* complaint acknowledged the Wicker World/Dimensional name and control change—and thus implicitly acknowledged the sale to Ford which is alleged in the *Dimensional* complaint to have been a seminal act in the later market manipulation—that the two complaints are, as to him, the "same cause of action." Were the Court to adopt that characterization the resolution of the *Candywyne* action would be res judicata and "conclusive as to all matters which were litigated or

might have been litigated in the first action." *McNellis v. First Federal Sav. & L. Ass'n*, 364 F.2d 251, 254 (2d Cir. 1966). No such result is possible, however, for measured by the applicable tests to determine whether claims are duplicative, *i. e.*, "whether a different judgment in the subsequent action would impair the rights created pursuant to the judgment rendered in the prior action; whether the evidentiary basis of the first and second actions is the same; or whether the essential facts and issues were similarly presented in both cases," *Expert Electric, Inc. v. Levine*, 554 F.2d 1227, 1234 (2d Cir.) (citations omitted), *cert. denied*, 434 U.S. 903 [98 S.Ct. 300, 54 L.Ed.2d 190] (1977), it is plain that *Candywyne* is no bar to *Dimensional*.

Examination of the two complaints reveals immediately that distinct derelictions are alleged in each. The *Candywyne* complaint focuses on the conduct of Levin and others which violated one fundamental purpose of the Securities Act of 1933, that is "to protect investors by promoting full disclosure of information thought necessary to informed investment decision." *SEC v. Ralston Purina Co.*, 346 U.S. 119, 124 [73 S.Ct. 981, 984, 97 L.Ed. 1494] (1953). The *Dimensional* complaint looks to the fraudulent trading activity, artificial pricing and concomitant gain to the defendants involved, concerns which reach beyond the informational needs of investors to protect as well "the integrity of the marketplace in which securities are traded." *United States v. Brown*, 555 F.2d 336, 339 (2d Cir. 1977). Certainly the duty to comply with registration provisions of securities law is not co-extensive with that of eschewing fraudulent conduct in the creation of a market for those securities. The two complaints fully reflect this difference.

The *Candywyne* complaint shows that the SEC then alleged that three things had occurred: Levin had caused the public distribution of Wicker World/Dimensional stock without proper registration or exemption; the record ownership

of the stock was not accurate; Wicker World/Dimensional control had passed to Ford. The last "fact" was entirely superfluous to the *Candywyne* complaint and the relief sought therein. Moreover, that complaint did not address the purpose or motive for any of these acts: such inquiry was unnecessary to make out the violation of securities law complained of in *Candywyne.* By contrast, the *Dimensional* complaint pursues the purpose of the acts alleged in the *Candywyne* complaint, and focuses primarily on the one fact which was immaterial in *Candywyne* —the transfer of control to Ford. The reason for that transfer, an element of no moment whatever in *Candywyne,* is essential in the prosecution of this action. Different proof will be needed to support the allegation in this complaint that the Regulation A offering of Wicker World/Dimensional and subsequent transfer of control by Levin to Ford were part of a scheme to manipulate the market for those shares.

Clearly, by the tests of similarity of fact and of proof, these two complaints state different causes of action. Moreover, insofar as rights and obligations were created pursuant to the *Candywyne* judgment, Levin cannot complain that activities not encompassed by that judgment expose him to additional sanctions. Although the *Candywyne* consent judgment puts in repose the fact of the Wicker World/Dimensional Regulation A offering by itself, the allegation that the offering was merely a predicate to market manipulations abetted by Levin implicates further obligations imposed by securities law. Res judicata is not applicable here, for this is not a case where the two complaints allege "the violation of but one right by a single legal wrong." *Bal-*

*timore Steamship Co. v. Phillips,* 274 U.S. 316, 321 [47 S.Ct. 600, 602, 71 L.Ed. 1069] (1927).

Upon reviewing the factual bases of the SEC's summary judgment motion—the Information to which Levin pleaded guilty and his statements during the course of the criminal proceedings—the Court finds no reason to reverse its position and adopt the opposite view.[9] Accordingly, the SEC's motion for injunctive relief is granted.

■ The Commission contends that "there is no genuine factual dispute that Levin realized at least $36,000.00 as a result of his sale of Dimensional stock to Ford." Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment Against Defendant Leonard Levin ("SEC Memorandum II") at 22. While it appears that Levin did profit from the deal and should disgorge funds wrongfully gained, the Court does not agree that the amount involved is conclusively established. Levin did receive $58,000.00 from Ford for the Dimensional securities package. Exhibit E at 169. The SEC contends that Levin disbursed $22,500.00 to other shareholders and personally retained the rest of the money. To support this contention, the SEC cites portions of Levin's testimony at Ford's trial in which he describes getting checks from Ford, writing checks made out to other Dimensional shareholders, and using the money that went into his account to pay off certain people to whom he owed money. Exhibit E at 130, 133, 139. Levin's testimony does not state the exact amount of the checks that he wrote to the other Dimensional shareholders, and the Court has not been provided with copies of those checks that were apparently introduced at trial. *See* Exhibit E at 133 (trial testimony referring to exhibits 8 and 9, which were checks

9. The SEC contends that the Court's prior decision is now "the law of the case" and should not be relitigated. *See Petersen v. Federated Dev. Co.,* 416 F.Supp. 466, 473–74 (S.D.N.Y. 1976), *citing Zdanok v. Glidden Co.,* 327 F.2d 944 (2d Cir.), *cert. denied,* 377 U.S. 934, 84 S.Ct. 1338, 12 L.Ed.2d 298 (1964). While this argument is not without merit, the Court does *not rest on the law of the case doctrine.* The Court's earlier decision held that the SEC's suit against Levin was not barred by res judicata because "by the tests of similarity of fact and of proof," the complaint stated a different cause of action. The Court now holds that Levin's guilty plea, and his testimony concerning his involvement in Ford's scheme, establish that the instant action encompasses a broader range of activities than those involved in the *Candywyne* suit and are sufficient for summary judgment.

made out to two individuals). Levin states that he delivered $27,000.00 to other shareholders, although he provides no documentary or other evidence to support this claim. While the Court is inclined to accept the $22,500.00 figure claimed by the SEC, it has not "set forth specified facts" showing that there is no genuine issue for trial. Fed.R.Civ.P. 56(e).

The SEC's contention that Levin personally retained the remainder of the funds suffers from a similar deficiency in proof. Levin contends that he "paid finder's and legal fees in excess of $14,000.00, and incurred other costs and expenses of nearly $20,000.00 including $9,300.00 which went to pay salaries of employees of Wicker World, Inc." Levin Aff. ¶ 11(b). He does not support these contentions with any affidavits or documents and his bald assertions are entitled to little weight. *See SEC v. Research Automation Corp., supra,* 585 F.2d at 33–34. Furthermore, as stated by the Commission, "[Levin's] expenses in carrying out his scheme and in defending himself are hardly appropriate or legitimate deductions from the amount he received for his own benefit." SEC Supplemental Memorandum at 5. Yet the SEC bears the burden on this motion for summary judgment and the evidence presented does not conclusively establish that none of the money received by Levin was expended for legitimate business purposes (*i. e.,* salary payment to Wicker World employees). His trial testimony that he used a portion of the funds to pay off certain individuals does not negate the possibility that other expenditures were made that should be deducted in determining the amount of money Levin personally realized on the deal.

Therefore, although the evidence presented so far tends to support the $36,000.00 figure claimed by the SEC, the question is not sufficiently free from doubt to be resolved on a motion for summary judgment. Accordingly, the matter will be referred to Magistrate Buchwald who will then issue a report and recommendation to the Court. The amount that Levin must disgorge will be determined at that time.

In opposing the SEC's summary judgment motion, Levin contends that the action should be dismissed on the basis of forum non conveniens because: (1) the SEC has previously instituted the *Candywyne* action, which allegedly arose from the same transaction, in Florida; (2) witnesses necessary for a hearing or trial are located in Florida; and (3) his "constrained economic circumstances" makes the SEC's selection of a New York forum inequitable. Levin Aff. ¶¶ 10, 11. Even if the doctrine of forum non conveniens were applicable in this case, the action would not be *dismissed,* for the *transfer* provisions of 28 U.S.C. § 1404(a) govern here. *See Mars, Inc. v. Standard Brands, Inc.,* 386 F.Supp. 1201, 1204 (S.D.N.Y.1974); *Fiorenza v. United States Steel Int'l, Ltd.,* 311 F.Supp. 117, 120 (S.D.N.Y.1969).

Because the Court has granted the SEC's motion for summary judgment, no trial need be held either here or in Florida, although a disgorgement hearing will be held before a Magistrate. There is no reason why such a hearing should not be conducted in New York. Levin's forum non conveniens arguments, to the extent they could even apply to a Magistrate's hearing, do not come close to establishing that the action should be transferred "[f]or the convenience of parties and witnesses, in the interest of justice." 28 U.S.C. § 1404(a); *see McCrystal v. Barnwell County,* 422 F.Supp. 219, 222–25 (S.D.N.Y.1976); *Schneider v. Sears,* 265 F.Supp. 257, 263 (S.D.N.Y.1967). Furthermore, as suggested above, the Magistrate's determination could conceivably be based on documents submitted by the parties, thus avoiding the need for Levin to come to New York. Finally, it would appear expeditious for the same Magistrate to conduct the disgorgement hearings in both the Ford and Levin cases. Accordingly, Levin's forum non conveniens motion is denied.

*Conclusion*

The SEC's motion for summary judgment against Ford is granted to the extent that it seeks a disgorgement order following a Magistrate's hearing and recommendation.

The motion for injunctive relief will be denied sixty days from the entry of this Opinion unless the SEC submits additional evidence regarding the likelihood of future violations.

The SEC's motion for summary judgment against Levin is granted and a permanent injunction shall be issued. The Court will not issue a disgorgement order, however, until the matter is reviewed by Magistrate Buchwald who will make a recommendation regarding the amount of money wrongfully received.

The SEC is directed to submit judgment on notice.