John R. PATTERSON, et al., Plaintiffs,

v.

NEWSPAPER AND MAIL DELIVER-
ERS' UNION OF NEW YORK AND
VICINITY, et al., Defendants.

EQUAL EMPLOYMENT OPPORTUNI-
TY COMMISSION, Plaintiff,

v.

NEWSPAPER AND MAIL DELIVER-
ERS' UNION OF NEW YORK AND
VICINITY, et al., Defendants.

In the Matter of Pending Charges Filed
with the EEOC against The New York
Times and the Daily News Pursuant to
the Terms of the Settlement Agreement,
U.S.D.C., S.D.N.Y. 73 Civ. 3058 (WCC)
and 73 Civ. 4278 (WCC).

Nos. 73 Civ. 3058 (WCC), 73 Civ.
4278 (WCC).
Claim No. 230.

United States District Court,
S.D. New York.

March 28, 1991.

Julius LeVonne Chambers, Charles Ste-
phen Ralston, Ronald L. Ellis, Eric Schnap-
per, New York City, for New York News
Employees, Malcolm Stokes, et al.

Thomas W. Gleason, New York City
(Harvey S. Mars, of counsel), for appellant

Newspaper and Mail Deliverers' Union of New York and Vicinity.

Holtzmann, Wise & Shepard, New York City (David S. Lindau, Gerald T. Hathaway, of counsel), for New York News, Inc.

### OPINION AND ORDER

WILLIAM C. CONNER, District Judge.

A class of private plaintiffs and the Equal Employment Opportunity Commission ("EEOC") brought two civil rights actions in 1973 against the Newspaper and Mail Deliverers' Union of New York and Vicinity ("NMDU" or "Union") and more than fifty publishers and news distributors within the Union's jurisdiction. Both suits charged that the Union, with the acquiescence of the publishers and distributors, had historically discriminated against minorities, and that the structure of the collective bargaining agreement, combined with nepotism and cronyism, had perpetuated the effects of past discrimination in violation of Title VII of the Civil Rights Act of 1964. Each lawsuit sought an affirmative action program designed to achieve for minorities the status they would have had in the newspaper delivery industry but for the alleged discriminatory practices.

On September 19, 1974, then-District Judge Lawrence W. Pierce issued an opinion and order approving a settlement between the parties and incorporating the Settlement Agreement in a Consent Decree, familiarity with which is presumed. *See Patterson v. Newspaper and Mail Deliverers' Union*, 384 F.Supp. 585 (S.D.N.Y. 1974) *aff'd*, 514 F.2d 767 (2d Cir.1975), *cert. denied*, 427 U.S. 911, 96 S.Ct. 3198, 49 L.Ed.2d 1203 (1976). The Settlement Agreement implements an affirmative action program which modifies the hiring procedures for newspaper deliverers under the industry-wide collective bargaining agreement. It also established an Administrator, appointed by the Court, to implement the provisions of the Consent Decree and to supervise its performance. The Settlement Agreement authorizes the Administrator to hear claims concerning violations of the Consent Decree. Appeals from his decisions are heard in this Court.

The action presently before the Court is an appeal from the Administrator's ruling of June 7, 1990. For the reasons set forth below, his ruling is reversed.

### BACKGROUND

The New York News (the "News") and NMDU appeal the Administrator's dismissal without prejudice of all charges brought by ten News employees in the proceeding, denominated "Claim 230." [1]

In August and September of 1986 several New York Times ("Times") employees filed charges of discrimination with the EEOC alleging that both their employer and the NMDU had engaged in discriminatory conduct. In the spring of 1987 a group of News employees also filed with the EEOC charges of discrimination against the NMDU and their employer. Unlike the Times employees, who were pursuing their allegations of discrimination before both the EEOC and the Administrator in Claim 186, the News employees had not brought these claims of discrimination before the Administrator. In the spring of 1988, the Administrator asked the EEOC to produce a list of persons who had filed charges against any defendants in the *Patterson* case. The EEOC responded on May 18, 1988 with a list that included these Times and News employees, whose charges were then pending. In June 1988, the EEOC dismissed the News claimants' EEOC charges and issued to each a Notice of Right to Sue. Each notice contained the same explanation for the dismissal of the charge: "The court-appointed Administrator of the Consent Decree in *Patterson v. NMDU* and *EEOC v. NMDU* has assumed jurisdiction of these cases." Supplemental Record on Appeal ("SOA") at 40–50.

---

1. The ten employees opposing this appeal are: Richard Harvey, Robert Hatton, Floyd Hollington, Abdullah Khalifa, Jack Lavache, Clifford MaGloire, Jose Maldonado, Calvin Sandy, William Speights, and Malcolm Stokes.

Upon receipt of copies of the right to sue letters from the EEOC, the Administrator called a meeting of the thirteen News and twelve Times employees identified by the EEOC. The purpose of said meeting was to review the charges filed by each of the employees (a) to determine the status of each charge; (b) if settled or moot, to dismiss said charges; (c) if still pending, to determine whether the matter could be dealt with administratively; and (d) if the charge could not be settled, to set a date for trial. At the meeting, the NAACP Legal Defense Fund ("LDF") requested that the Administrator adjourn all matters regarding employees who had received right to sue letters from the EEOC, to afford them an opportunity to file a federal complaint based on those letters. The Administrator thereupon refused to entertain the merits of the grievances and mandated that the parties submit briefs on the proper scope of his jurisdiction.

All but two of the News employees who were included in Claim 230 filed a complaint alleging violations of Title VII in federal court. *Stokes, et al. v. The New York News Corp., et al.*, 89 Civ. 3108 (JFK).[2] The Times employees who were included in Claim 230 also filed a Title VII action. *Johnson, et al. v. NMDU, et al.*, 88 Civ. 6789 (WCC).

The News employees who had filed the complaint in *Stokes* advised the Administrator that they would not be pursuing the matters raised in the federal complaint before him:

It is not our intention to pursue the matters that are raised in our complaint in Federal Court before the administrator; ... the charges that the EEOC had and which are the basis of Claim 230 we

believe have not been submitted to the administrator and we do not intend to submit them to the administrator with regard to the Daily News.

Record on Appeal ("ROA") at 69.

On June 7, 1990, the Administrator issued the determination in Claim 230 which held that he lacked exclusive jurisdiction over Title VII claims. On that basis, the Administrator dismissed without prejudice all charges in Claim 230 involving minority employees at the News who had brought a Title VII action, with the exception of Daniel Roberts.[3] The Administrator also dismissed without prejudice all charges subsumed in Claim 230 of Times employees who had brought a Title VII action except for the charges of those employees who were plaintiffs in Claim 186 and thus were barred from relitigating their claims by the doctrine of res judicata.

The NMDU and the News now appeal the Administrator's dismissal without prejudice of the EEOC charges brought by the ten News employees. The NMDU contends that the Administrator has exclusive jurisdiction over these employees' charges of discrimination because all such claims must be remedied through the Settlement Agreement's enforcement procedures. Unlike the NMDU, the News does not assert that the Administrator has exclusive jurisdiction, but contends, rather, that he must proceed to consider the merits of the charges of the ten News employees. Finally, the News contends that the Administrator's failure to dismiss portions of five of the News employees' charges on res judicata grounds is reversible error.

## DISCUSSION

■ Paragraph 4 of the Settlement Agreement provides, in relevant part:

Pursuant to Judge Keenan's memo-endorsed order dated June 25, 1990, the *Stokes* case, which is pending class certification, is being held in abeyance until the instant appeal is determined.

2. Two News employees who were included in the original Claim 230 notice are not plaintiffs in *Stokes* nor are they subjects of the determination on appeal.

The named plaintiffs in the *Stokes* action include the ten employees opposing this appeal, Donald Roberts, John Taylor and Edward Goins. Donald Roberts, who also filed EEOC charges and received a right to sue letter, was a member of the original plaintiff class in *Patterson*. Neither Taylor nor Goins are involved in this appeal.

3. The Administrator held that Roberts, an original named member of the private class of plaintiffs in the *Patterson* Action, was required to litigate his complaint before the Administrator unless the remedy sought was unavailable under the Agreement. ROA at 17.

In addition to the powers specified herein, the Administrator shall be empowered to take all actions (including the establishment of such additional recordkeeping and the employment of such mediators and fact finders) as he deems necessary to implement the provisions and to ensure the performance of the Order. The Administrator or his designee shall hear, and the Administrator shall determine, all complaints that any individual in the bargaining units in the industry represented by NMDU has been allegedly denied equal employment opportunities on the basis of race, color or national origin and the Administrator shall also decide any questions of interpretation and claims of violation of the Order by any party or by any such individual employee or applicant for employment, acting either on his own initiative or at the request of any interested person or party.

The precise language of paragraph 4 does not require the Administrator to seek out for adjudication alleged violations of the Settlement Agreement, any more than it requires that he act upon news reports or rumors of possible violations. Rather, the Administrator is authorized to act upon "complaints that any individual ... has been allegedly denied equal opportunities" and "claims of violation by ... any such individuals." Complaints and claims require complainants and claimants. If no person or entity seeks adjudication of a discrimination claim, there is no "complaint" or "claim" under the Settlement Agreement. Absent a complaint, the Ad-

ministrator is neither required nor empowered to assert jurisdiction to determine the merits of a suspected violation. His role is not to render rulings concerning the rights of individuals who have not assumed an adversarial role.[4]

 The LDF asks this Court to adopt an interpretation of Paragraph 4 of the Settlement Agreement which is unreasonably narrow in light of the intent of the parties to the Consent Decree. The LDF posits that because none of the News claimants sought adjudication *before the Administrator* of the matters referred to in their EEOC charges, the Administrator was without discretion to assume jurisdiction over the disposition of these allegations. Paragraph 4 nowhere says or implies that there must be a complainant or claimant who seeks adjudication *before the Administrator.* It is enough that, as here, a complaint (i.e. a charge) be made to the EEOC and that the Administrator, acting on his own initiative, and with the concurrence of the appropriate EEOC official, assumes jurisdiction of the matters covered by the charges.[5]

That the News claimants claim to have suffered racially motivated employment discrimination is beyond dispute. Each of them submitted specific grievances to the EEOC asserting that they had been denied equal employment opportunities by both the NMDU and the News. Each of them obtained right to sue letters from the EEOC authorizing legal action; and a majority of them sought redress under Title

4. While Paragraph 4 of the Settlement Agreement authorizes the Administrator to take all actions "as he deems necessary to implement the provisions and to ensure the performance of the Order," the Administrator's adjudicatory power, as an exercise of authority under a consent decree entered by a federal court, is limited to a determination of the merits of actual "cases" or "controversies." This Court does not agree with the NMDU's assertion that "the administrator is empowered to assert jurisdiction over *any* activity which would threaten the Decree's integrity whether or not a specific individual or group of individuals brings the illicit activity to the administrator's [or any other body's] attention." NMDU Reply Memo at 5. This Court's conclusion regarding the Administrator's jurisdiction to hear charges of discrimi-

nation should not be interpreted as in any way curtailing the powers accorded the Administrator under the terms of the Settlement Agreement.

5. That the instant Title VII claim falls within the ambit of the Administrator's jurisdiction has been recognized explicitly by the EEOC, the agency entrusted with the initial determination of the existence of alleged Title VII violations. In response to the discrimination charges filed by the News claimants, the EEOC issued right to sue letters to each claimant specifying that "the Court-appointed Administrator of the Consent Decree in *Patterson v. NMDU* and *EEOC v. NMDU* has assumed jurisdiction of these cases."

VII for defendants' alleged discriminatory conduct in federal court. In light of the plain meaning of Paragraph 4, the LDF's argument that the News claimants had no complaints or claims is untenable. Paragraph 4's grant of jurisdiction to the Administrator over *all* claims of the denial of "equal employment opportunities on the basis of race, color or national origin" is not dependent upon the preference of an individual litigant to have his claim decided before the Administrator.[6] Plainly, the LDF's construction of Paragraph 4 is unreasonably narrow, and is inconsistent with the broad remedial purposes for which the Consent Decree provided for the appointment of an Administrator.

The Administrator characterized Claim 230 as involving the "scope of the authority of the Administrator in relation to the filing of Title VII complaints in the federal courts in the Southern and Eastern Districts of New York by minority newspaper deliverers at the New York Times ... and [the News]." ROA at 6. He defined the issue to be decided as:

"whether the Administrator has exclusive jurisdiction under the terms of the [Settlement Agreement] to hear the factual allegations which are the basis of the Title VII Complaints."

ROA at 10.

In his determination in Claim 230, the Administrator determined that he would not exercise jurisdiction over the News claimants' grievances since to do so would preempt their "rights" to seek independent relief under Title VII for discrimination based on race, color, and national origin. ROA at 6. He concluded:

[I]t is the opinion of the Administrator that the [Settlement Agreement] can not be construed to mean that the Administrator has exclusive jurisdiction to hear all Title VII actions and thus that all minority deliverers are barred from bringing new Title VII actions, or to approach this matter from a different angle, the [Settlement Agreement] did not mean that all minority deliverers had waived their rights to bring new Title VII actions except to the extent they were barred by the doctrines of res judicata and collateral estoppel.

ROA at 10–11. This Court finds that the Administrator's decision in Claim 230 misstated the issue to be decided. Having properly assumed jurisdiction of the claims alleged in the EEOC charges, the Administrator was without discretion to decline jurisdiction solely because such claims might also be the subjects of a separate lawsuit. Such was the basis, however, for the Administrator's dismissal of "all matters in Claim 230 now pending before me involving minority employees at the Daily News who have brought a Title VII action," except for Donald Roberts. ROA at 17.

In an Opinion and Order dated December 12, 1986, this Court stated:

At the February hearing, the only issue before the Court will be whether the consent decree should be terminated with respect to some or all of the defendants. The hearing will not be for the purposes plaintiff has suggested: *i.e.*, to determine whether defendants have violated Title VII of the Civil Rights Act of 1964 or the consent decree. If plaintiffs be-

---

**6.** For the past sixteen years the Administrator has been hearing and determining claims brought by NMDU members regarding discriminatory treatment and denial of equal opportunity within the New York newspaper industry. The large majority of such claims have involved individuals who were not members of the private class of plaintiffs in 73 Civ. 3058.

Until the recent federal action filed by the LDF there have been, since the entry of the Final Order approving the Settlement Agreement, no lawsuits filed against any defendant alleging discrimination in the bargaining unit represented by the NMDU. Instead, allegations of discrimination have either been settled di-

rectly with claimants or presented to the Administrator.

During this sixteen-year period the EEOC and the New York State Division of Human Rights ("NYSDHR") have forwarded to the Administrator for his exclusive consideration almost all charges of discrimination filed by NMDU members with those agencies. On some occasions, such discrimination charges were not forwarded to the Administrator because the employers settled the complaints directly with the individuals involved, the EEOC and/or the NYSDHR without the need for the Administrator's intervention.

lieve that defendants have violated the consent decree, they should apply to the Administrator for relief pursuant to the decree. If they believe that the decree was insufficient to end discrimination in the industry, they must bring a new action for the relief they seek. The Court cannot grant such relief by modifying the consent decree.

It is clear beyond question that the judicially approved and monitored Settlement Agreement expressly authorized the Administrator to adjudicate claims of discrimination. It has long been the position of this Court that if an individual seeks to remedy a wrong contemplated by the Consent Decree, that individual could apply to the Administrator for relief pursuant to the Consent Decree. A letter from Chambers dated May 18, 1987 regarding this Court's Opinion and Order dated April 3, 1987, states explicitly: "The settlement agreement ... covers alleged violations of Title VII involving race, color or national origin. Such claims are to be heard by the Administrator, William S. Ellis, Esq." News Exhibit I.

According to the Administrator's determination in Claim 230, individuals who are not members of the private class of plaintiffs in the original *Patterson* litigation are not barred from engaging in independent Title VII litigation by the existence of the Consent Decree's dispute resolution machinery. ROA at 14–15. The Administrator found such conclusion to be required in light of the language of the Supreme Court in *Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974).

The Administrator's reliance on *Alexander v. Gardner–Denver* was misplaced. That decision was limited to the preclusive effect of an arbitral decision made under a collective bargaining agreement. In *Alexander,* the plaintiff, following his discharge

from employment, filed a grievance alleging that his employer had violated the anti-discrimination provisions of his union's collective bargaining agreement. When the contract arbitrator held that Alexander had in fact been discharged for cause, Alexander initiated a Title VII action against his employer in federal court. The Court in *Alexander* found that arbitration did not adequately protect the independent federal rights that Title VII was designed to safeguard and held that Alexander had not waived his cause of action under Title VII by participating in the arbitration proceeding. In so finding, the Court distinguished arbitration from judicial proceedings on four grounds, none of which is applicable here.

First, an arbitrator may not have the expertise to resolve legal questions that arise in Title VII actions. *Alexander,* 415 U.S. at 56–57, 94 S.Ct. at 1023–24. The Administrator, however, was appointed by the court because he possessed such expertise. Indeed, with respect to the approval of the Settlement Agreement in the *Patterson* action, the court overruled objections to the appointment of the Administrator in which his abilities were an issue. *Patterson v. NMDU,* 384 F.Supp. 585, 593–95. Moreover, the Administrator has subsequently administered the Settlement Agreement for more than sixteen years, itself some evidence of expertise.

Second, the court noted that "the fact-finding process in arbitration usually is not equivalent to judicial factfinding." 415 U.S. at 57, 94 S.Ct. at 1024. By contrast, civil discovery and trial procedures apply to proceedings before the Administrator. Moreover, the Administrator's determinations are appealable, and when hearing such appeals, the scope of this court's review is not the very limited review permitted with respect to arbitration awards.[7]

7. In *Foreman v. Wood, Wire & Metal Lathers Intl. Union Local No. 46,* 557 F.2d 988, 992 (2d Cir.1977), the Court of Appeals for the Second Circuit noted that the scope of review of an independent administrator appointed to ensure compliance with a settlement decree was *similar* to that applied to an arbitrator's decision. The court, however, declined to decide whether the standard of review was in all aspects the same. More recently, in *United States v. International Bhd. of Teamsters,* 905 F.2d 610 (2d Cir.1990), the Second Circuit Court reiterated that an administrator's decision is "entitled to great deference."

Third, the court noted that in arbitration a concern "is the union's exclusive control over the manner and extent to which an individual grievance is presented." 415 U.S. at 58, n. 19, 94 S.Ct. at 1024, n. 19. Under the Settlement Agreement, however, grievants have direct access to the Administrator and have been represented by independent counsel. This comports with Title VII's administrative procedures.

Lastly, the Court in *Alexander* stated that an arbitrator derives his authority solely from the collective bargaining agreement and has no authority "to invoke public laws that conflict with the bargain between the parties...." 415 U.S. at 53, 94 S.Ct. at 1022. In contrast, the Administrator is empowered by the judicially approved and monitored Settlement Agreement by which he is expressly authorized to adjudicate claims of discrimination. The Settlement Agreement in this case was not the product of collective bargaining negotiation but was the end result of two large Title VII suits in which a class of private litigants and the EEOC sought relief on the basis of racial discriminatory acts allegedly prevalent in New York's newspaper industry. It cannot be doubted that the EEOC and class claimants were vigilant in the original *Patterson* action in the enforcement of plaintiff's Title VII rights. The Administrator, an experienced attorney, suffers from no inability to construe Title VII in the light of legislative history and judicial precedents.

The LDF asserts that the News employees whose EEOC charges were subsumed in Claim 230, while minority individuals employed within the NMDU bargaining unit, are not parties to the Settlement Agreement. Nor are they, the LDF claims, in privity with the original private class of plaintiffs. Therefore, the LDF posits, these claimants are not bound by the provisions of the Settlement Agreement which provides for an Administrator to resolve all claims of discrimination. The LDF makes repeated reference to such original private class of plaintiffs. This narrow focus on

the existence and identity of the members of the defined class in this lawsuit might be appropriate if the Settlement Agreement had resolved only the personal claims of the class members, and if the injunctive relief had been designed to benefit only the members of that limited class. The Settlement Agreement, however, resolved not one, but two, lawsuits alleging violations of Title VII, and provides broad injunctive relief. One of the two lawsuits, 73 Civ. 3058, was brought by a class of private plaintiffs.[8] The other was brought by the EEOC (73 Civ. 4278), and was consolidated with the private action.

Only five of the forty-two paragraphs in the Settlement Agreement relate solely to the members of the original private class. Paragraph 9 required specific employment action, long ago implemented, with respect to some of the named plaintiffs in the private action. Paragraphs 36, 37, and 38 provide for one-time monetary payments relating to members of the private class. These were paid long ago. Paragraph 39 defines the private class, and identifies Appendix B as a listing of the thirty-six individuals who were known by defendants at the time of execution of the Settlement Agreement to be members of the private class. All of the other paragraphs of the Settlement Agreement regulate the employment practices of the defendants with respect to any minority individual, and not just private class members. As stated in the Settlement Agreement:

> ... [D]efendant employers ... will be *permanently enjoined* from engaging in any act or practice which has the purpose or the effect of discriminating against *any individual* or class or individuals in their bargaining units represented by the NMDU on the basis of race, color or national origin. They shall not fail or refuse to hire for employment *any such individual* on the basis of race, color or national origin, nor shall they take any other action which would deprive *any such individual* of equal employment

8. The Court did not certify the plaintiffs as a class under Rule 23 of the Federal Rules of Civil Procedure. The private plaintiffs are described

and referred to in ¶¶ 37 and 39 of the Settlement Agreement.

opportunities or otherwise offset his status as an employee or as an applicant for employment because of such individual's race, color or national origin.

Settlement Agreement, ¶ 2 (emphasis added). Each of the News claimants complains that he has been denied employment opportunities within the bargaining unit represented by the NMDU in violation of Title VII. Paragraph 4 of the Settlement Agreement commands the Administrator to hear any such charges which complain of discrimination on the basis of race, color or national origin.

Furthermore, as the EEOC was a party defendant in the original *Patterson* litigation and a signatory to the Consent Decree, it is clear that the parties intended the Consent Decree to subsume alleged violations of Title VII.[9] This is borne out by the language of the Settlement Agreement providing:

> The Order resolves all issues between plaintiffs and defendants, who have agreed hereto, relating to alleged acts and practices of discrimination by said defendants to which the Order is directed, and with respect to such matters, compliance with the Order shall be deemed to be compliance with Title VII and shall be deemed to satisfy the requirement for affirmative action by said defendants of any of them.

Settlement Agreement at ¶ 42. This identification between the terms of the Settlement Agreement and the requirements of Title VII indicates the parties' intent that discrimination claims be remedied through the Consent Decree's specific enforcement procedures.

The Administrator must follow the strictures of the Settlement Agreement. No provision of the Consent Decree authorizes the Administrator to decline jurisdiction because one of the parties proposes to initiate (or has initiated) a separate action concerning the same matter. Paragraph 4 of the Settlement Agreement requires that the Administrator hear and determine or decide all complaints and claims of violation of the Consent Decree. The wording of the paragraph gives the Administrator no discretion in this regard; it provides that he or his designee "shall hear, and the Administrator shall determine, all complaints that any individual" in the NMDU bargaining unit may have concerning employment discrimination on the basis of color, race, or national origin. A failure of the Administrator to take jurisdiction over claims properly presented to him for adjudication is not only inconsistent with the terms of the Order, but is also inconsistent with considerations of judicial efficiency and economy which have required that alleged violations of the Consent Decree be presented to the Administrator expressly appointed to hear such claims.

Thus, it was not appropriate for the Administrator, at the Conference on Claim 230, to state that "I shall decline to hear any claimed violations on the grounds that the parties wish to pursue this remedy before a District Court and they are in effect asserting to me that if I proceed with a hearing, that I will in some matter prejudice the rights of their clients." ROA at 29–30. Nor was there any need or justification for his finding in Claim 230 that the Settlement Agreement cannot be construed to mean that the Administrator has exclusive jurisdiction to hear all Title VII actions. ROA at 10. It was not for the Administrator to determine within the context of Claim 230 whether any other court, agency or other forum may properly consider a complaint which the Settlement Agreement authorizes to be raised with the Administrator.[10]

---

**9.** The provisions of the Settlement Agreement do not indicate that plaintiffs *waived* their Title VII rights by agreeing to submit Title VII claims (of the type contemplated by the Consent Decree) to the Administrator. On the contrary, submission of such grievances is the functional equivalent of a plenary lawsuit, since compliance with the Consent Decree is tantamount to compliance with Title VI. Settlement Agreement ¶ 42. Moreover, appeals from the determinations of the Administrator are heard in this Court.

**10.** The Court likewise expresses no view as to whether the Administrator's jurisdiction of discrimination claims within the scope of the Consent Decree is exclusive, although it is difficult to see how court rulings in Title VII actions

The Settlement Agreement and the prior Orders of this Court have mandated that complaints of alleged violations of the Consent Decree are to be heard and determined by the Administrator. Manifestly, it was not within the Administrator's discretion to dismiss the charges of discrimination brought by the News' claimants. Accordingly, the Administrator's determination in Claim 230 is reversed.[11] The Administrator is instructed to hear the claims brought by the News claimants before the EEOC. To the extent that the EEOC charges which underlie Claim 230 make allegations which, if proved, would constitute violations of the Consent Decree, the Administrator shall reach a determination on their merits. Should the Administrator find that the Consent Decree cannot afford adequate relief or "is insufficient to end" the discrimination complained of, he should reserve judgment and advise claimants of their right to bring a new action independent of the Consent Decree.

## CONCLUSION

For the foregoing reasons, the determination in Claim 230 as it applies to the News Claimants is reversed and the Administrator is directed to hear and determine such claims of discrimination as are contemplated by the Settlement Agreement.

SO ORDERED.

brought by individual plaintiffs seeking more favored positions on the employment ladder could fail to interfere with the intricate and delicately balanced scheme of affirmative action established by the Decree.

11. Because the Administrator's determination in Claim 230 is reversed on other grounds this Court does not reach the News' contention the Administrator's failure to dismiss portions of five of the News employees' charges on res judicata grounds is reversible error.